Robert D. Eckard
Robert Eckard & Associates, P.A.
3110 Palm Harbor Blvd.
Palm Harbor, FL 34683
(727)772-1941
Attorneys For Steven Short

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

                       **Case Number: S3 19CR-704 (LAP)**

**v.**

**STEVEN SHORT,**

     **Defendant.**

_____

## SENTENCING MEMORANDUM ON BEHALF OF STEVEN SHORT AND ORDER PROBATION TO REVISE AND CORRECT PRE-SENTENCE INVESTIGATIVE REPORT FOR FACTUAL INACCURACIES AND/OR OMMISSIONS

SENTENCING DATE:
May 3, 2023

Honorable Loretta A. Preska,
United States District Judge
Southern District of New York

Page 1 of 35
*USA v Short*; Case Number S3 19CR-704 (LAP)

Internal Number 7480-2109

*"I hope someday to have so much of what the world calls success, that people will ask me, "What's your secret?" and I will tell them, "I just get up again when I fall down."*

-Paul Harvey

## I.     PRELIMINARY STATEMENT

Good people make mistakes. Good people make bad decisions. Good people, after all, are people. Mr. Short is a good person who has endured physical and emotional trauma from an early age and in a way, Mr. Short's success has been always getting back up. Mr. Short is no angel nor has ever proclaimed himself to be. Mr. Short is not charged with a crime of violence, nor charged as part of a drug trafficking organization, nor part of any criminal enterprise, nor a crime, the likes this jurisdiction, is familiar with[1]. Nevertheless, while Mr. Short has no interest in gathering any headlines for his crime, Mr. Short recognizes that the crime he has pled guilty to, a "financial crime" is just as wrong, against the law and with consequences that are, in many ways, no less devastating and life altering.

Mr. Short, like many that have stood before Your Honor in the past and will undoubtedly stand before Your Honor in the future, has his faults—as we all do. However, Mr. Short's life as described by him, his wife, his family and friends and

---

[1] From the largest Ponzi Scheme in U.S. history with Bernie Madoff to the FTX-Sam Bankman-Fried crypto trading case.

supported by his medical records, tells a story of a man who, despite the odds stacked against him at a rather early age, wanted to do good and follow the law. Without any formal higher education after the 9th grade and notwithstanding eventually earning his high school G.E.D, Mr. Short wanted to be self-sufficient and not rely upon the government for his needs. Mr. Short thought that by creating a budgeting and internet-based software program (after teaching himself computer programming) that included teaching consumers about debt reduction strategies, and then packaging such a "program" to sell to anyone that would buy it, he would be on the path to self-fulfillment. This "desire" (even desperation) would allow him to make money running his own business and helping others.

Mr. Short is described by his family and friends in loving and caring ways in letters addressed to Your Honor, attached as composite **Exhibit A**, all start with Dear Judge Preska or Your Honor:

**"He has been my rock in my strength ever since he was a small boy, and his father, and I divorced. I am ashamed to share with you, the environment in which he grew up. Because, if I am being completely honest, I was the very first person in his life to take advantage of his kind and loving nature. His entire childhood was a nightmare of my own making. I leaned on him constantly and imbued responsibility on Amir, child, drumming into his brain, that no matter what he was responsible for his little brothers. It was so holy unfair to put that way on the shoulders and something I have spent a lifetime regretting...there was a near constant barrage of violence, alcohol and drug abuse around him. He was forced to endure. The many men introduced into our lives, humiliated and abused by some, ignored and cast by others. I made horrible decisions to head**

far-reaching consequences for my children. He witnessed .... atrocities every other day, a murder right in front of our newest house on the very first night we were there. Gunshots every other night and weekly raids by law enforcement for the two months we lived there. And from there I moved us to an abusive roommate situation, where he felt he couldn't say anything about his abuse, because at least it was better than seeing someone get to [sic] death! There was a homeless shelter we stayed in for a time or the house in the crack neighborhood, I moved us into after that.  And yet he endured it all without a complaint.” Sandra Short-Hutchins, Steven Short's mother

“Steve is a dedicated son to his dad About 5 years ago when his dad had a heart attack and had to have triple by-pass Steve went to the hospital every day to be with him.”- Jane Short, Steven Short's Stepmom

“Steve was a good man with a kind heart.” -Brian Barton, Retired Law Enforcement Officer of 31 years

“Steve is my granddaughter's [Karissa Dyar] husband. I have known [him] for over 20 years. Steve is kind, loving and extremely loyal…He supports [our granddaughter} Karissa in everything she does; he is her rock.”-June Dyar

“He [Steve] treats my cousin [Karissa Dyar] like a queen.”-Kaley Parrott

“There was one time in my life, when I was in a very dark place. I had just lost the woman who had raised me, and I considered to be a mother figure. I was lost and felt very alone. Steve would often check in and talk to me during those times of need. There was one evening he came up to pick me up and we went to a waffle house. He ordered me a hot chocolate and just listened to me cry and tried to reassure me that everything will be all right. That may not seem like a big deal to some people. However, in that time of my life all I needed was someone to be there for me and just as he always was. Just as he is there for others, as I have witnessed over the years.” -Lauren Whitby, friend since 9 years old

“He is never too busy to help a friend… and after knowing him all these years that he is a good man.” -Susan Mullins, family friend
“He [Steve] was always such a sweet, wonderful little boy. … He was a big brother to my two younger brothers. He was always helping his mom out by

Internal Number 7480-2109

**taking care of her…of his two brothers, all that he could."-** Jane Volr, Mr. Short's Aunt

**"There have been countless times where he goes out of his way to help others, putting his own needs on the back burner whether it's his own mother, brother, father, friends are other acquaintances, he is always there to lend a hand or help in anyway he can."** Holly Short, Steven Short's Sister-In-Law

Along with others attached to this memo, these statements are but a small glimpse into some of the people and lives who Steve Short has made a positive and loving difference.

However, as the author Keri Russell once wrote:

*"Sometimes, it's the smallest decisions, that can change your life forever."*

In 2012, Mr. Short, made another "bad" decision. It's that decision, one he voluntarily and consciously made, was to "do business" with CardReady, the company owned and operated by the co-defendant in this case, Brandon Becker, as well as others, that has resulted in (1) a 2015 stipulated monetary judgment in excess of $12,000,000 joint and severally with other listed Defendants by the Federal Trade Commission and the Florida Office of The Attorney General ("FLAG") for Unfair and Deceptive Trade Practices, being disgorged of and forfeiting to the Receiver for the Federal Trade Commission and FLAG, all money and tangible property and assets in his possession and custody; permanent bans

on telemarketing; opening credit card merchant accounts for credit card processing or acting as an Independent Sales Organization ("ISO") for credit card processing; and (2) being Indicted in 2021 in this instant case based upon the facts in the 2015 action and now standing at the mercy of this Honorable Court.

We have all heard……"*there is always more to the story*"… and this case is no exception.

## II.   INTRODUCTION

The author, Alfred Alcorn, once wrote "*The moral high ground to which I aspired had turned into a slippery slope,*" a turn of phrase that aptly describes the trajectory of Mr. Short's brief attempt at running a business he thought could help many. Mr. Short's life, filled with homelessness as a child, being subjected to domestic violence as a child, witnessing acts of extreme violence, and years of sickness will forever be changed again. While Mr. Short makes no excuses for his conduct and recognizes his wrongful conduct in this case and accepts full responsibility for that conduct with deep remorse, he stands before this Honorable court, repentant and broken. But for the love and commitment from his wife who has stood by his side, and those family and friends closest to him, he might not otherwise have any remaining **hope** for his future….but he does… and because he

does have hope, he will statistically[2] (as combined with his age (47 years old), health conditions and effects of the collateral consequences of this conviction) be significantly less likely to engage in recidivism and more likely to be higher in compliance with mandated supervision obligations and societal expectations. The question today before this Court is: ***What kind of* sentence does a man like Steven Short deserve?** Thus, for a district court judge, the sentencing of a criminal defendant is the most difficult, gut-wrenching duty that he or she must perform. *United States v. Wilson*, 827 F. Supp. 2d 747, 761 (E.D. Mich. 2011).  According to the Government's assessment, the guidelines call for a 78–97-month sentence, and the Court should impose something within that range. We disagree. The guideline range offers no useful advice and should not be heeded because it (1) is the product of a guideline that is not based on empirical evidence or national experience; (2) fails to take any account of Mr. Short's culpability, low risk of recidivism, need for effective medical care, need to make restitution, or collateral punishment; (3) would result in unwarranted disparity as compared

---

[2] U.S. Sentencing Comm'n, *Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines* 12 (May 2004) (noting that recidivism rates "decline relatively consistently as age increases"), *available at* www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_Criminal

Internal Number 7480-2109

with sentences for similarly situated defendants; and (4) is far greater than necessary to promote the goals of sentencing in this case.

The undersigned respectfully requests that a sentence reflecting the personal characteristics of Mr. Short and considering the 3553(a) *Post-Booker* factors, that a sentence of 30-41 months is appropriate. The Court must impose a "sentence that is sufficient, but not greater than necessary, to comply" with the purpose of sentencing. §18 U.S.C. 3552(a). **<u>First</u>**, the goal of sentencing "is to lock in a sentence that is not too short and not too long, but just right to serve the purposes of 3553(a). *United States v Irey*, 6123 F.3d 1160, 1197 (11th Circ. 2010) (en banc). **<u>Second</u>**, there is no statutory requirement that a guideline sentence be imposed. **<u>Third</u>**, the undersigned respectfully requests that the Court impose a sentence outside and below the guideline range that more accurately reflects: (1) Mr. Short's conduct and in proportion to the un-sentenced co-Defendants conduct and other (more) culpable parties, who were never criminally charged to the best of the undersigned's knowledge, for their involvement in this case; (2) Mr. Short's personal characteristics; (3) other 3553(a) factors; (4) and cooperation with the Federal Bureau of Investigations vis-à-vis a proffer on August 21, 2015 to the

United States Attorney's Office, Middle District of Florida in 2015,[3] attached as

**Exhibit B**. The undersigned submits that the 2015 proffer "opened the door" for

and provided law enforcement with material information resulting in and/or

significantly contributing to the United States Attorneys' Office in this case

(S.D.N.Y.) in obtaining an Indictment against more culpable co-defendants in

addition to the successful prosecution by the Federal Trade Commission against

the New York ISO identified in the Third Superseding Indictment[4], to wit:

---

[3] Under the 18 USC §3553 (a) Booker factors, it is important for the Court to consider all relevant conduct in this case, and that while the undersigned counsel for Mr. Short recognizes that the proffer agreement, aka, *Kastigar* Letter, provided to Mr. Short by the United States Attorney's Office (USAO), Middle District of Florida, **was only binding as to a prosecution by that USAO**, that *Kastigar* letter did provide for that USAO to move for a "substantial assistance" downward departure under USSG 5K.1.1 in the event of a prosecution by that office only. It seems unfair that Mr. Short could cooperate with one United States Attorneys Office (MD FL) and then not be afforded some benefit from a sentencing perspective from another United States Attorney's Office (SD NY), both within the control of the United States Department of Justice.

[4] See Paragraph 8, Sealed Indictment (Dkt. 81, July 8, 2021.

Internal Number 7480-2109

8.    During the Relevant Time Period, CardReady was a company headquartered in Los Angeles, California, commonly referred to in the payment-card processing industry as a "sales agent" or sub-Independent Sales Organization ("sub-ISO"). CardReady offered card processing services to businesses that wanted to be able to accept credit or debit cards. Specifically, among other things, CardReady helped to prepare and submit merchant applications to a New York City-based independent sales organization (the "New York ISO") that had a contractual relationship with Payment Processor-1 and Bank-1.

In the F.B.I.'s 302 [heavily redacted] report dated May 31, 2016, in the parallel prosecution/investigation in the Middle District of Florida with the FTC, FLAG and USAO Middle District of Florida, provided to the undersigned by the United States Attorneys' Office Southern District of New York in Discovery in this case[5],  the FBI Special Agent wrote that although not "entirely successful" and that although some customers were dissatisfied with the product [Mr. Short's "internet-based budgeting program"] based upon ex-employee interviews, "potential victims" stated the "*case is negatively impacted by the fact that phone records, ex-employees, documentation and occasional victim testimony negatively*

---

[5] USAOCR_66186-187

Internal Number 7480-2109

*impacted the case against…Short."* The point of bringing this to the Court's attention, although not a defense to the crime charged, is to explain to this Court the program that Mr. Short sold which he believed was legitimate, albeit, with a questionable rate of success, was an internet-based budgeting program. Mr. Short fully recognizes the difference between what he purported to sell consumers and "how" that program was sold using sham merchant accounts and gaining access to the credit card processing system through CardReady, First Data/First Pay and Bank-1 (Wells Fargo) which was a violation of Wells Fargo's stated guidelines for such approval of a credit card merchant account. Mr. Short accepts full and complete responsibility for his role in that sequence. In addition, Mr. Short was the last person indicted in this instant case, yet the first one to accept responsibility and enter a guilty plea. Mr. Short has been living with the consequences of his actions since 2015.

### III. THE 3553(A) FACTORS SUPPORT A DOWNWARD VARIANCE AND A SENTENCE BELOW THE GUIDELINES IS JUST AND APPROPRIATE

#### A. THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

**(i) TUMULTUOUS UPBRINGING.** As explained in his PSR interview with the Probation Officer and in letters written by his mother, Mr. Short grew up in a family filled with domestic violence and constant relocation. By the time he was

15 years old, his parents had divorced and he had often times lived with his mother and siblings in homeless shelters. Mr. Short witnessed further domestic violence against his mother at the hands of multiple boyfriends until such time as Mr. Short's mother made him move out of the house because her boyfriend didn't want him living there. At 15 years old and in 9th grade, Mr. Short was homeless and on his own completely. He quit school to work to be able to eat and pay for a living. The undersigned submits that the well-drafted S3 Indictment over exaggerates Mr. Short's level of intellectual abilities and business acumen. In the undersigned's humble opinion, Mr. Short's "need to survive" at a very early age affected his ability to understand the full scope of what he was doing that allowed him to become a necessary actor in this case.

**(ii)    A husband and family man.**

Mr. Short has been married to his wife for 11 years and together with her for 19 years. Although they never had children, they have each other. Ms. Dyar is a critical care nurse and has been by her husband's side literally in "sickness and in health" but more through the former.



*Figure 1 Steven Short and wife, Karissa Dyar*

### (iii)    Defendant's medical history and condition.

Without going through all of Mr. Short's medical history, Mr. Short just recently (early 2023) underwent a massive reconstructive jaw and mouth surgery twice that involved a complete extraction of all his teeth and re-building of his entire jawbone due to cysts that have plagued him and affected his health for the better part of the last 10 years. See attached **Exhibit C.** Mr. Short was also recently evaluated by Forensic Psychiatrist Eric Kaplan who diagnosed Mr. Short with sever anxiety disorder, sever depression, and other trauma related factors. See attached **Exhibit D**.

Internal Number 7480-2109

**B.**     THE NATURE AND CIRCUMSTANCES OF THE OFFENSE INCLUDING RELEVANT CONDUCT AND PROPORTIONALITY.

It is important to note that the New York ISO, identified by the United States in the paragraph 8 of the S3 Indictment referenced above, First Pay Solutions/First Data and in press releases[6] for this case where the individual Defendant, Chi W. Ko, aka Vincent Ko., in *Federal Trade Commission v First Data Merchant Services, LLC and Chi W. Ko, aka Vincent Ko,* Case Number 1:20-cv-3867 (S.D. N.Y) that owned and/or operated the New York ISO, had a judgment entered against him in the amount of $270,373.70. His company, First Pay Solutions/First Data paid $40,200,000.00 to "*settle FTC Charges of Assisting Fraudulent Scheme and Credit Card Laundering*".[7] The United States put forth a statement in this instant case stating "*…reviewed and evaluated new merchant applications submitted by CardReady to determine whether to accept the merchants for processing with payment Processor-1 and Bank-1 pursuant to standards and guidelines set for by the New York ISO, Payment*

---

[6] United States Attorneys' Office, Southern District of New York, Friday, October 11, 2019; *See also*, United States Attorneys' Office, Southern District of New York, Thursday, July 6, 2021. Available upon request.

[7] See Press Release by the Federal Trade Commission dated May 19, 2020, 'Worldwide Payment Processor and Payment Industry Executive to Pay $40.2 Million to Settle FTC Charges of Assisting Fraudulent Scheme and Credit Card Laundering." Available upon request.

Internal Number 7480-2109

*Processor and Bank -1"*[8] and according to the Federal Trade Commission "… *processed payments for at least four deceptive schemes that have been the subject of the FTC or U.S,. Department of Justice law enforcement actions.*"[9] It appears quite clear to the undersigned, that while Mr. Short knew about the relevant acts as between him and CardReady and the Co-Defendants in this instant action (as well as other un-indicted persons), it seems obvious to the undersigned that Mr. Short was used in a very limited capacity in this instant case by a much larger and sophisticated organization, who dictated "the rules of the game" and who engaged in conduct about which only the Federal Trade Commission and the United States Department of Justice knows the details. However, to the best of the undersigned's knowledge and research, neither Chi ("Vincent") Ko and others that, "*ignored numerous warnings . . . from Wells Fargo*[10] *executives" and "broke the law over a number of years"* was ever criminally charged with a single crime. In other words, while Mr. Short acknowledges and accepts responsibility for his relevant conduct, it

---

[8] See S3 Indictment, Page 4 paragraph 9.

[9] See Federal Trade Commission v First Data Merchant Services, LLC and Chi W. Ko, Case Number 1:20-cv-3867 (S.D. N.Y.) (Dkt 1, Page 2 of 56, Paragraph 3) and that these defendants included "…a criminal enterprise that used stolen credit card data to bill consumers without their consent."

[10] Bank-1 in the S3 Indictment in this case.

Internal Number 7480-2109

would be a gross miscarriage of justice to believe or lead this Court to believe that Mr. Short, with a 9th grade education and G.E.D. who lived close to "paycheck to paycheck" in Pinellas Park, Florida, had the financial ability, financial and human resource, global connections to merchants, payment processors, and banks, including the "negotiation" skills or leverage to be considered anything but a "small gear" in this "wheel of fraud." Mr. Short was tantamount to "the foot" while other co-defendants and third parties, including Vincent Ko and First Data and First Pay, were the "rest of the body," especially the "brain." The time frame that the United States alleged Mr. Short engaged in this conduct was approximately 20 months.

### C.   THE NEED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT

The sentence proposed by the undersigned which includes a period of incarceration of 30-41 months adequately reflects the seriousness of the offense, culpability of the Defendant considering his personal characteristics, and promotes respect for the law providing just punishment, but no greater than necessary.

### D.   THE NEED TO DETER.

Research has consistently shown that while the certainty of being caught

Internal Number 7480-2109

and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels ... reached that conclusion, as has every major survey of the evidence." *Id.; see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime,* 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Typical findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch *et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates...were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded

Internal Number 7480-2109

that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes,* 33 Criminology 587 (1995); *see also* Gabbay, *supra,* at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). Nevertheless, the undersigned's proposed sentencing range acts as a deterrent to others as well as supports the U.S.S.C. data for Fiscal Year ending 2022 for §2B1.1 offenses in the Southern District of New York.[11]

**E.   THE NEED TO PROTECT THE PUBLIC.**

Mr. Short, a 47-year-old married man, with no "crime of violence" is not an offender that poses a danger or threat to society. Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases

---

[11] Source: U.S. Sentencing Commission, 2022 Datafile, USSCFY22, Table 17.

Internal Number 7480-2109

in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. § 994(j). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* 18 U.S.C. § 3551 note.

### F.   THE KINDS OF SENTENCES AVAILABLE

This is a Zone D, Category I classification that does not allow for any sentencing alternative other than incarceration per §5C1.1(f).

### G.   THE SENTENCING GUIDELINE RANGE

The advisory sentencing guideline calculation was stipulated as follows:

U.S.S.G. Manual used: 2021

USSG section applied:     2B1.1(a)(1)

**Base Offense Level:**                                            7

Total "Loss"[12]                                                         +20
10+ Victims or
mass marketing[13]                                                    +2

      Defendant derived >$1M gross[14]          +2

      Departure
      Early disposition[15]                                  -1
      Acceptance of Responsibility[16]             -2

      **Resulting Offense Level:**                   28[17]

---

[12] Pursuant to §2B1.l(b)(l)(K) because the total loss is more than $9,500,000 and less than $25,000,000, the offense level is increased by 20 levels. However, as will be further addressed **and urged by Counsel** for Mr. Short in this Memorandum, this "loss" amount, although "stipulated" to, requires a deeper analysis and consistent with the United States Sentencing Commission 2015 Amendment by amending Application Note (3)(A)(ii) to §2B1.1, should focus more specifically on the on the Defendant's culpability. And as was addressed herein, "[T]here are circumstances where loss, alone and in connection with other offense characteristics, may substantially overstate the seriousness of the offense." HEARING ON PROPOSED AMENDMENTS TO THE FEDERAL SENTENCING GUIDELINES Before the U.S. Sentencing Comm'n, 114th Cong. 12 (March 12, 2015) (testimony of James E. Felman on behalf of the American Bar Association).

[13] Pursuant to §2B1.1(b)(2)(A)(i) and (ii). However, as addressed herein **and urged by Counsel** for Mr. Short in this Memorandum, the number of "victims" is questionable by the undersigned.

[14] USSG §2B1.l(b)(17)(A),

[15] USSG §3El.l(b)

[16] USSG §3E1.1(a)

[17] Criminal History Category I.

Internal Number 7480-2109

Final Guideline Range                      78 to 97 months'

    **Recommendation:**                      **30-41 months**

**Imposition of Fine:**

In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to §5El.2. At Guidelines level 28, the applicable fine range is $25,000 to $250,000. Mr. Short respectfully requests that a fine be waived pursuant to the factors outlined in 18 U.S.C. §3572(a)(1), including Mr. Short's income, earning capacity and financial resources[18] as agreed to in the PSR, Paragraph 85 (Dkt. 141, Page 18 of 31) and the Restitution Ordered in the amount of $1,912.090.05 per 18 U.S.C. §3572(a)(4)[19].

**Imposition of Restitution: Interest and Penalties**

Mr. Short also respectfully requests that after a term of incarceration is imposed that any fine and/or restitution ordered be set to begin thirty (30) days

---

[18] The PSR incorrectly overstates Mr. Short's Total Net Worth as it includes the marital home, solely in his wife's name and purchased by her with income from her job as a nurse.

[19] 18 U.S.C. 3572(b)FINE NOT TO IMPAIR ABILITY TO MAKE RESTITUTION.—

    If, as a result of a conviction, the defendant has the obligation to make restitution to a victim of the offense, other than the United States, the court shall impose a fine or other monetary penalty **only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution** (emphasis added).

Internal Number 7480-2109

after Mr. Short's release from incarceration pursuant to 18 U.S.C. 3572(d) and that so long as Mr. Short complies with the payment schedule set forth by this Honorable Court through the United States Probation Office, that no penalties with respect to the payment of restitution shall apply.

**Costs of Incarceration as Additional Fines**

The Sentencing Guidelines clearly designate that all costs of incarceration and supervised release are fines, pursuant to U.S.S.G §5E1.2 and therefore, Mr. Short respectfully requests that this Honorable Court enter such Order allowing Mr. Short to begin making such payments, including all interest and penalties, thirty (30) days after Mr. Short's release from incarceration.

**H.**    **PERTINENT POLICY STATEMENTS OF THE SENTENCING COMMISSION**

The proposed sentencing recommendation by the undersigned, of 30-41 months of incarceration is consistent with the U.S.S.C. sentencing data for fiscal year ending 2022 for sentences imposed relative to the guideline range by the primary sentencing guideline, and in particular Guideline §2B1.1 offenses where there were a total of 5,206 cases and a variance downward in 2,175 cases.

## I. THE NECESSITY OF AVOIDING UNWARRANTED DIFFERENCES AMONGST SENTENCES FOR DEFENDANTS CONVICTED OF SIMILAR CONDUCT WHO HAVE SIMILAR CRIMINAL RECORDS.

This is the factor which most strongly supports Defendant's request to be sentenced outside of the applicable advisory guideline range as recommended by Mr. Short. The most similarly situated defendants were those indicted as part of the related case and those that were never indicted but arguably much more culpable.  Under the factors set forth in 18 U.S.C. §3553(a), Mr. Short respectfully submits that a sentence below the guideline range is appropriate in the instant case.  As the Supreme Court made clear in *Rita v. United States*, 127 S.Ct. 2456, 2466 (2007), there is no presumption at the district court level in favor of a Guideline sentence and the district court's focus should not be on imposing a "reasonable" sentence; rather, this court's mandate is to impose *"a sentence sufficient, but not greater than necessary,"* to comply with the basic aims of sentencing. *Id*. (quoting §3553(a)'s "parsimony provision," emphasis added). In this case, that analysis strongly supports imposing a sentence below the Guideline range.

"While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case."

Internal Number 7480-2109

Allan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses,* 25 Crim. Just. 34, 37 (2011); *see also United States v. Ovid,* slip op., 2010 WL 3940724,*1 (E.D.N.Y. Oct. 1, 2010) ("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad of factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so.").  A substantial variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which are taken into account by the guideline range.

### J. THE IMPORTANCE OF PROVIDING RESTITUTIONS TO ANY VICTIMS, IF APPLICABLE.

In the instant case, an accurate restitution amount is not known.

## OBJECTIONS TO THE PRESENCE INVESTIGATION REPORT[20]

Defendant, by and through the undersigned counsel, hereby submits his Objections and request for an Order from this Court directing the United States Probation Department to amend the PSR in this case filed on November 7, 2022 (Dkt. 141) pursuant to (Fed. R. Crim. P. 32(f)(1). Federal Rule of Criminal Procedure 32(i)(3) provides in relevant part that:

> [a]t sentencing, the court:
>
> (A) may accept any undisputed portion of the presentence report as a finding of fact; [and]
>
> (B) must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing ....

---

[20] The undersigned respectfully requests this Honorable Court to consider objections to the Pre-Sentence Investigation Report ("PSR") outside the 14-day timeframe as stated in Fed. R. Crim. P. 32(F)(1) (**as updated information was not available during that time frame**) and Order Probation to amend and update the PSR accordingly so as not to allow form over substance but arguably allowed under the Plea Agreement, Page 3 and 4 respectfully, in this case, to wit:

> The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).
>
> …
>
> Except as provided in any written Proffer Agreement(s) that may have been entered into between this Office and the Defendant, nothing in this Agreement limits the right of the parties (1) to present to the Probation Officer or the Court any facts relevant to sentencing,

Internal Number 7480-2109

Fed. R. Crim. P. 32(i)(3)(A)–(B).

**Identifying Data (Page 3 of PSR)**

> **PSR:** Education: Graduate Equivalency (unconfirmed)
> **Correction:** See Attached Composite **Exhibit E** (4 pages). Florida Department of Education, High School Diploma, 28th day August, 1998.

**Charges and Convictions: (age 4 of 31, Paragraph 2)**

> Mr. Short pleaded guilty to Count 1, Conspiracy to Commit Wire Fraud and Bank Fraud. **Mr. Short was not charged in Counts 2 or 3.** Mr. Short was charged in Count 4, Bank Fraud, but pursuant to the plea agreement, **the USAO will dismiss that Count at the time of sentencing.**

**Codefendants (Page 6 of 31, paragraph 9)**

> Although the PSR states that the charges against STEVEN BREIR "remain pending," the undersigned notes that STEVEN BREIER appeared as a co-defendant in all four (4) counts of this case per S2 Indictment (Dkt. 17) but does not appear as a co-Defendant in the S3 Indictment dated July 8, 2021.

**The Offense Conduct (Page 6 of 31, paragraph 11)**

> **PSR:** Materials used for this Probation Officer's Presentence Investigation include the following: charging instruments, the defendants plea agreement, and the SDNY U.S. Attorney's August 16, 2022, press release.

> **Correction/Addition**: At the time of Mr. Short's PSR interview with the Probation Officer, the undersigned provided the probation Officer a detailed, extensive, and organized binder of Mr. Short's medical records[21]

---

[21] The medical records reflect Mr. Short's medical history including Chronic back pain with T-10 anterior compression deformity with angular kyphosis, ADHD, obstructive sleep apnea, COPD. In addition, Mr. Short has recently undergone extensive jaw reconstruction surgery including complete teeth extraction due to Odontogenic cysts with massive infection.

and medications. Additionally, Ms. Karissa Dyer, Mr. Short's wife, was interviewed by the Probation Officer.

**Accountability (Page 8 of 31, paragraph 23)**

**PSR: STEVEN SHORT** responsible for a loss of amount of more than $9,500,000 and less than $25 million. Role, adjustment, information, and loss amounts and loss amount attributable to the other co-defendants are awaited from the Government.

**Correction/Revision**:    While Mr. Short, for purposes of the plea agreement did stipulate to a loss in excess of $9,500,000 and less that $25,000,00, **there has been no further role adjustment or loss amounts provided by the Government other than stated in the Plea Agreement. In addition**, **and importantly** the loss amount in excess of $9,500,000 as stated, was attributed **not to Mr. Short exclusively, but also to the other fifteen (15) co-defendants in the initial** *Federal Trade Commission v E.M. Systems* **litigation**[22], **including CardReady and co-defendant Brandon Becker**, *joint and severally*.

**Victim Impact (Page 8 of 31, paragraph 23)**

**PSR:** The provision of the Mandatory Victim, Restitution Act of 1996 applies to this Title 18 offense. The victims of the instant offense, or the customers of the debt reduction business who "invested" thousands of dollars with the telemarketing companies noted in the offense narrative did not earn any of the promised returns. The Government provided that the number of victims of the offense well exceeds 10, but that the total number is still being calculated. At the time the report was concluded, the Government reported that they have no specific contact information for victims available to share with Probation, but that they hope to a fulsome account of the total number of victims, the losses, and their identities at Sentencing.

---

[22] *See* Federal Trade Commission et. al. v E.M. Systems, LLC, Case Number 8:15-cv-1417-T-23AEP (Dkt. 145 [Amended Judgment in a Civil Case in the amount of $12,365.731.00… against CardReady, joint and severally].

Internal Number 7480-2109

**Correction/Revision**.   As of the date of this filing by the undersigned, there has been no identification of the numbers of victims, the names or identities of any victims or any amounts allegedly lost by any of the "10 or more" victims. The undersigned has always maintained that if there is a "victim", it could be Bank-1, Wells Fargo, and therefore only ONE "victim." However, even this assertion would be inconsistent with the evidence since Discovery in this case established that refunds to customers did in fact occur in addition to chargebacks from the merchants, resulting in no financial consequence to customers, in addition to the $40.2 million dollar payment from First Data through Vincent Ko's company, First Pay, to consumers. If the [sham] merchants did not have enough in reserves to pay the chargebacks (or were no longer in business], then the chargebacks would be imposed on CardReady and or First Pay/First Data, who were also complicit as demonstrated in the Defendant's Sentencing Memorandum,[23] in addition to the F.B.I.'s 302 report dated February 6, 2019 and witness interviews conducted by the FBI and AUSA in this instant case[24].

## Part C.        Offender Characteristics

**(Page 13 of 31, paragraph 57-<span style="color:red">Mr. Short's corrections noted in red</span>)**

**PSR:**  The defendant described the social economic conditions of his childhood in Florida as poor. He explained the following incident of [sic] domestic dispute with his father, they were forced to move into a shelter for a few years. He related that his mother struggled to provide the basic necessities needed for a proper upbringing. The defendant recalled having to move residences at least 20 times during his childhood. When asked how that emotionally affected him, defendant related that his childhood lack stability, and he did not make any friends. Short reported that when he was 15 years old, he intervened in a domestic incident between his mother and her boyfriend. [**Mr. Short saw multiple and repeated incidents of**

---

[23] See Supra at FN_____
[24] See USAOCR_00007330-74490

Internal Number 7480-2109

**domestic violence against his mother.]** He stated that as a result of [**one particular incident**] this incident, he wanted to have his independence and began working a job until he saved enough to move out. **[Mr. Short did not want to move out. Mr. Short at the age of 15 years old was told by his mother he had to move out because her boyfriend did not want him living with them in the house and as a result was homeless and had to quit school so he could afford food and pay for somewhere to live]**. He disclaimed any incidents of abuse or maltreatment during his childhood. The defendant related that he was reared in observance of Christianity in remains a devout believer of the faith.

**(Page 13 of 31, paragraph 58- Mr. Short's corrections noted in red)**

**PSR:** Short reported that the neighborhoods that he was reared in were crime ridden. He related that as a child. He witnessed numerous assaults and even saw a [**man shot and killed**] ~~deceased body discovered~~ by law enforcement in his neighborhood. The defendant could not relate how this emotionally affected him.

**Educational. Vocational and Special Skills**

**(Page 15 of 31, paragraph 74)**

**PSR:** We requested educational verification but did not receive a response.

**Correction:** Copy of Florida High School Diploma and education records attached as **Exhibit E.**

**Financial Condition:  Ability to Pay**

**(Page 17 of 31, paragraph 81)**

The PSR incorrectly lists the marital residence as an asst of Mr. Short. This is not correct and therefor overstates his net worth. The marital home was purchased from an instututional lender[25] by his wife, Karissa Dyer, with income from her job as a nurse. Furthermore, since Mr. Short and Ms. Dyer are married, the property is not only homestead property but under Florida law,[26] owned as tenants by the entiries. However, Mr. Short did not apply for the loan to puchase the house, nor was his income, credit or financial information used by the bank for Ms. Dyer to purchase the house.

**(Page 18 of 31, paragraph 82)**

The Accurint document referred to in the PSR was not reviewed by the undersigned, however, the home is marital, a tenancy by the entirety property, purchased by Ms. Dyer.

**Restitution**

**(Page 19 of 31, paragraph 97)**

**PSR:**   Indicated a stipulated amount to be $1,912,090.05 shall be ordred in this case. Restitution information from each victim has been requested and still awaited from the Government.

---

[25] Supporting documents available upon request.

[26] The Florida Statutes, and in some cases the Florida Constitution, protect the following properties owned by an individual from being subject to creditor claims[26].:

Homestead.  Generally, homestead will not be subject to creditor claims unless the owner gives a mortgage or other lien on the property[26].  The Florida constitution generally protects to one-half (1/2) acre of homestead within city limits and up to one hundred sixty (16)) acres outside of a city. Fla. Const. Art. X §4.

Internal Number 7480-2109

**Revision Requested:**        The facts as stated in the instant case as set forth in S3 Indictment stem from a Federal Trade Commision case resulting in judgments against all Defendants in 2015 as stated herein. To this day, no victims have been specifically identified and the number of alleged victims remain unknown. It is also unknown whether any of those alleged victims have been made whole in some or all of their claims. Title 18 §3664 and Fed. R. Crim P. 32(c) addresses restitution. It directs the Government, at least 60 days prior to sentencing, to consult with all identified victims to obtain a restitution amount and to provide that information to the probation officer.[27] The probation officer then must provide notice to the victims of the offense of conviction, the amount of restitution, the date of the sentencing hearing and the availability of a lien. The officer must also inform victims of the chance to submit additional information through provided affidavits.[28] Notwithstanding Mr. Short's stipulation to restitution, the undersigned does not see how restiution should be ordered in this case when not one victim has been identified, much less any proof of any amounts sought by any such victims that may have already been restituted.

**(Page 27 of 31, Special Condition 1)**

Mr. Short objects to a "Special Condiction" of supervised releaase that he participate in an outpatient treatment program. While on pretrial release and as a condition of his bond status, Mr. Short sbmits top random urin screens and has not vilated this condition. In addition, Mr. Short's disclosre of use of recreational drug more than 25 years ago in no way indicates he has the need for drug treatment nor rationally related to the crime chargesed or any indication that drugs played any role in the crime charge or for Mr. Short's conduct.

---

[27] 18 U.S.C. §3664(d)(1)
[28] 18 U.S.C. §3664(d)(1)

Internal Number 7480-2109

**(Page 27 of 31, Special Condition 6)**

Mr. Short objects to a "Special Condiction" of supervised releaase that he shall undergo a sex-offense specific evaluation and participate in an outpatient sex offender treatment and/ or outpatient mental health program. Mr. Short has not been charged with possession, distribution or manufactuering of child pornographty or any other sex-related offense or any conditions under the Adam Walsh Act for pretrial release. Mr. Short has not asserted any grounds that indicate in any way the financial crime he committed and plead guilty to was caused by or resulted from a sex or sexual related addition of any find. There is no evidence in this case provided to the uinbdersignbed that would correlate this Special Condition with any matters or evidence in this case. Mr. Short has maintained his Florida State compliance with the Florida State Sex Offender registry for 25 years.

**Addendum to the Presentence Report**

See Objections above.

Internal Number 7480-2109

## REQUEST FOR SELF SURRENDER AND BUREAU OF PRISONS PLACEMENT[29]

Mr. Short respectfully requests this Court to recommend to the B.O.P. that his term of incarceration allow for self-surrender to FPC Pensacola, Federal Prison Camp, 110 Raby Avenue, Pensacola, FL 32509, Telephone 850-458-7291 within 30 days of sentencing.

## CONCLUSION

For the reasons set forth above, the Defendant, Steven Short hereby requests that this Honorable Court grant a variance from the advisory sentencing guideline range because it would serve the underlying statutory purposes of 18 U.S.C. §3553(a) and based upon the 2015 Sentencing Reform Act, recent authority and caselaw cited herein as well as the most recent sentencing statistics by the United States Sentencing Commission, Quarterly Report, Fiscal Year 2022 for §2B1.1 offenses as grounds for departure considering the particular factors in this case

Mr. Short also respectfully requests the Court to Order that the Presentence Investigation Report be revised, corrected and or amended by Probation consistent with the above stated grounds based upon Defendant's Objection to the

---

[29] B.O.P. Policy Statement 5100.08-BOP welcomes a sentencing judge's recommendation and does what it can to accommodate it and 18 U.S.C. §3621(b)(4)(B) contemplates it.

Internal Number 7480-2109

Presentence Investigative Report.

Respectfully submitted,

**Robert D. Eckard, Esq.**
*Admitted Pro Hac Vice in New York*
Florida Bar No.: 0162655
Robert@RobertEckardLaw.com
**Drew K. Patterson, Esq.**
*Admitted Pro Hac Vice in New York*
Florida Bar No.: 1030836
Drew@RobertEckardLaw.com
**Robert Eckard & Associates, P.A.**
3110 Palm Harbor Blvd.
Palm Harbor, FL  34683
Telephone: (727) 772-1941
*Attorney for Defendant Steve Short*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 11.1

The undersigned hereby confirms that this paper complies with Local Rule 11.1(b)(1) as the font of the text contained herein is at least 13-point type or larger, for indents at least 12-point type and for footnotes are 10-point type.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on **April 18, 2023,** I electronically filed the foregoing with the Clerk of Court by using CM/ECF system with copies to David Lewis, Assistant United States Attorney, and Vlad Vainberg, Assistant United States Attorney for the Southern District of New York and the Clerk of United States District Court for the Southern District of New York using the CM/ECF System.

**Robert D. Eckard, Esq., B.C.S.**
Attorney for Defendant Steve Short
Admitted pro hac vice

Internal Number 7480-2109