**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 25, 2023

**By ECF**

Hon. Loretta A. Preska
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re: *United States v. Steven Short*, S3 19 Cr. 704 (LAP)

Dear Judge Preska:

The Government respectfully submits this letter in connection with the sentencing of defendant Steven Short, scheduled for May 2, 2023, at 10:00 a.m.

Short pled guilty in this case after entering into a plea agreement that stipulates an applicable sentencing range of 78 to 97 months' imprisonment.  In the Presentence Report, the Probation Office accepted the Guidelines calculations of the parties, and recommended a Guidelines sentence of 78 months' imprisonment.  (PSR at 23.)  For the reasons that follow, the Government submits that a sentence within the stipulated Guidelines range of at least 78 months is warranted here, reflecting Short's essential role in a long-running fraud that deceived credit card processing entities and victimized more than 19,000 consumers, many of whom were vulnerable people, of more than $19.7 million in losses.

## I.  The Offense Conduct

### A.  The Fraud Scheme

At all relevant times, Steven Short was the head of E.M. Systems & Services, LLC and affiliated companies (collectively, "E.M. Systems"), while Brandon Becker was the head of CardReady LLC ("CardReady").  (PSR ¶¶ 13-14.)  As part of its business, CardReady found merchants who wanted credit-card-processing services, such as E.M. Systems, and submitted merchant applications on behalf of those merchants to a Manhattan-based Independent Sales Organization called First Pay (the "New York ISO" in the Indictment).  First Pay then evaluated the merchant applications and referred acceptable merchant accounts up the chain to a payment processor, First Data ("Payment Processor-1" in the Indictment) and to Wells Fargo Bank ("Bank-1" in the Indictment). Wells Fargo and First Data, in turn, processed payments to merchants for purchases by customers who had used credit cards.  (*Id.* ¶ 16.)

From approximately 2012 until 2015, Short played a central role in a scheme with Becker and other CardReady employees and contractors to use the services of CardReady to obtain credit-card-processing services for E.M. Systems.  (*Id.* ¶¶ 16, 18.)  Short sought these credit-card-processing services so that he could operate an underlying telemarketing scheme through which

thousands of customers were sold services that would supposedly reduce their credit-card interest rates or their overall credit-card debt, as well as other purported "budgeting" services. (*Id.* ¶ 17.) In the course of this scheme, Short, Becker and their co-conspirators generated over $19.7 million in payments from thousands of customers who received deceptive cold calls promising to reduce their overall debt burdens. (*Id.* ¶¶ 15, 17.)  Short and E.M. Systems charged these victims fees ranging from $695 to $1,495 each. The telemarketing operation—coordinated by Short—resulted in hundreds of complaints by customers of fraud and deceptive tactics, and requests for millions of dollars in refunds and chargebacks. (*Id.* ¶ 15.)[1]

Short launched his E.M. Systems telemarketing scheme in 2012, arranging for boiler rooms that would cold-call people with outstanding debt and offer them purported "financial services" including interest rate reduction, debt consolidation, or a guarantee to reduce their overall debt burden by a specific amount.  By its nature, Short's telemarketing scheme targeted people who were already in severe financial straits—people whose credit problems were so severe that they were willing to pay up to $1,495 just to get help reducing their interest rate or overall debt burden.  In reality, what many victims reported receiving after paying up to $1,495 were worthless paper booklets that simply encouraged them to save more money, without actually reducing their interest rates or negotiating a debt reduction with a lender.  (*Id.*)

In order to be able to accept his victims' credit cards and debit cards, Short sought access to the credit-card-processing market through CardReady, which acted as a sales agent in the credit-card-processing industry.  (*Id.* ¶ 16.)  Short could not open and maintain a merchant account in his own name or E.M. Systems' name and truthfully disclose his telemarketing business for several reasons.  "Debt consolidation" and "interest rate reduction" services have a troubled history of being used to defraud consumers.  Because of this history, credit-card-processing companies, such as Visa and MasterCard, and other payment processing entities Wells Fargo Bank, First Data, and First Pay, prohibit in certain circumstances the processing of credit-card charges for such services under their respective guidelines (the "Guidelines").  PSR ¶ 17.  Further, credit card processing companies actively monitor merchants of all businesses, and permanently terminate accounts who generate an extraordinary number of customer complaints, refunds, and chargeback requests.  As Short knew, the deceptive products sold by his telemarketers would, and did, produce chargebacks from dissatisfied customers far in excess of the number and rate of chargebacks permitted under the Guidelines. (*Id.*)

Short and his co-conspirators at CardReady fraudulently subverted those prohibitions and monitoring processes by deceiving the credit-card companies, and payment processing entities, including Wells Fargo Bank, First Data, and First Pay, into opening merchant accounts and processing transactions.  To execute this deceit, Short authorized CardReady to create dozens of fictitious companies with fictional profiles and identities and associated fraudulent merchant accounts, which in reality processed payments for E.M. Systems. (*Id.* ¶ 18.)  Between approximately September 2014 and October 2014, Short and his co-conspirators opened and operated 26 sham merchant companies, each headed by a straw owner whom Short and co-conspirators called a "signer."  (*Id.*) The 26 signers for the 26 sham merchants typically had no business of their own and knew little or nothing about E.M. Systems' business.  In return for signing paperwork, the signers were paid nominal

---

[1] Unlike a refund, which is voluntarily processed by the merchant, a chargeback is a reversal of a transaction initiated by the customer through his or her credit card company due to unauthorized use, fraud, or failure to receive the product or serviced purchased, among other things.

fees of a few hundred dollars. In order to open these sham merchant accounts with First Pay, First Data, and Wells Fargo Bank, CardReady submitted fraudulent merchant account applications that concealed that E.M. Systems was the true underlying merchant and misstated various material terms about the nature of the stated supposed business. (*Id.*)  These applications typically claimed that the merchant was providing "budgeting" or "coaching" services instead of prohibited services such as interest rate reduction or debt consolidation services sold through telemarketing.  The applications also falsely described the physical site of the merchant's business, its workplace, and its employees, when in reality the signers had none. Based in part upon these false representations from Becker and CardReady, First Pay serially approved the sham merchant accounts and opened accounts for payment processing with First Data and Wells Fargo.  (*Id.* ¶ 19.)

Short and his co-conspirators were then able to use these 26 sham companies, with doing-business-as ("dba") names like "Your Next Financial Step", "Budgeting Insights", "Less Costly Living", "Prepared Budgeting", and "consignedsavings.com" to run credit card transactions rung up by telemarketers for E.M. Systems.  These companies concealed the true nature of Short's debt consolidation telemarketing scheme.  Short and his co-conspirators were able to keep the scheme alive even when the credit-card processing companies closed each individual sham merchant account whose consumers reported being defrauded and demanded chargebacks.  As the credit-card processing companies shut down one sham merchant after another, Short and his co-conspirators simply kept opening new ones, defeating the processing companies through a proverbial game of Whac-A-Mole. (*Id.* ¶¶ 15, 19.)  The first of these 26 accounts was opened in or about September 2012, and the last account was closed in or about October 2014.

Under E.M. Systems' deal with CardReady, CardReady was entitled to keep an astounding one-third of the credit card sale transactions of Short and E.M. Systems, in exchange for providing them access to the credit card processing network.  (*Id.* ¶ 16.)  This made it clear that the arrangement was a fraudulent one, since legitimate businesses rarely paid more than a few percentage points to process credit card transactions.[2]

By steering E.M. System's payment processing through these bogus merchant accounts, Short and his co-conspirators at CardReady accomplished a number of fraudulent purposes. First, the use of these bogus merchant accounts made it possible for E.M. Systems to conceal its identity from First Data and Wells Fargo and to maintain payment card processing. This was particularly relevant as First Data repeatedly required CardReady to close sham merchant accounts because of excessive chargebacks and reports of sales of prohibited services (*Id.* ¶ 19.) Short and his co-conspirators at CardReady then quickly replaced the closed sham merchant accounts with new sham merchant accounts, precluding First Data from shutting down its processing of the hidden but true merchant, E.M. Systems. (*Id.*) Second, the fraudulent processing scheme enabled E.M. Systems to spread out its charges, refunds, and chargebacks across multiple sham accounts. Short and his co-conspirators at CardReady thus enabled E.M. Systems to evade chargeback monitoring programs operated by Wells Fargo, First Data, and First Pay.  (*Id.*.)

For example, under the processing Guidelines, merchant accounts that accrued over 100 chargebacks per month and a ratio of more than 1% of chargebacks to transactions, were likely to be flagged and terminated. The sham merchant accounts associated with E.M. Systems averaged

---

[2] Short knew that the percentage he was paying to CardReady was wildly disproportionate to other credit-card-processing deals, as he acknowledged in his 2015 with the FBI.  (*See* FD-302 dated Sept. 24, 2015, attached hereto as Ex. A, at 8. (respectfully requested to be filed under seal)).'

over 10% chargebacks every month after July 2013, and ranged as high as approximately 61% chargebacks in August 2014, two months before First Data terminated the last of the sham merchant accounts. Collectively, these sham merchant accounts exceeded 100 chargebacks per month from July 2013 through October 2014. However, because E.M. Systems's transactions were split across the sham merchant accounts, none of the sham merchant accounts individually exceeded 100 chargebacks a month, delaying the process by which  each Sham Merchant Account was eventually flagged and terminated.

### B.  Loss Amount, and Unpaid Restitution and Forfeiture

As a result of this fraud scheme, according to records compiled by the Federal Trade Commission ("FTC"), approximately 19,902 customers of E.M. Systems paid approximately $19,718,305.  More than $6 million of this amount was repaid during the scheme, as customers demanded refunds and chargebacks based on allegations of fraud, deceptive tactics, and failure to receive the purchased services. (*Id.* ¶ 15.)  Many other customers, however, requested but never received a refund or chargeback, as described below.

Thus, the net actual loss in this case was $12,365,731.  Indeed, this is the precise amount of the civil monetary judgment to which both Short and his wife, Karissa L. Dyar—who helped run the E.M. Systems operation—admitted to in a "Stipulated Order of Permanent Injunction and Monetary Judgment" to which Short and Dyar agreed in 2016.  (Ex. B, at 9.)

## II.  Guidelines Calculation

The Probation Office has calculated the U.S. Sentencing Guidelines applicable to this offense consistently with what the parties stipulated in their plea agreement.  (PSR ¶¶ 27-38.)  While seeking a sentence outside the Guidelines, the defendant does not challenge the accuracy of Probation Office's Guidelines calculation to which he stipulated.[3]

Short's total offense level under the Guidelines is 28, based on the following:

- The offense has a base offense level of 7 pursuant to § 2B1.1(a)(1);

- A 20-level increase is warranted pursuant to § 2B1.1(b)(1)(K) based on an aggregate intended loss amount over $9,500,000 and less than $25,000,000[4];

- A 4-level increase is warranted pursuant to §2B1.1(b)(2)(A)(i) and (ii) because the offense involved 10 or more victims and was committed through mass marketing;

---

[3] In his sentencing submission, the defendant includes a "recommendation: 30-41 months." But it should be noted that this is the *defense's* recommendation, and is not contained in the plea agreement or the PSR.

[4] The PSR, consistent with the Indictment, correctly states that the scheme obtained more than $19 million from Bank-1 (but less than $25 million), which represented money processed and charged from thousands of customers who responded to cold calls from Short's telemarketers that deceptively promised to reduce their overall debt burdens in exchange for fees of up to $1,495. PSR ¶¶ 2, 15.

- A 2-level increase is warranted pursuant to § 2B1.1(b)(17)(A) because the defendant derived more than $1 million in gross receipts from a financial institution as a result of the offense; and

- A 3-level decrease is warranted pursuant to § 3E1.1(a) and (b) because the defendant demonstrated acceptance of responsibility for the offense by timely entering a guilty plea.

Short's criminal history category is I.  (PSR ¶ 45.)  Based on an offense level of 28 and a criminal history category of I, the applicable Guidelines range is 78 to 97 months' imprisonment. (PSR ¶ 83.)

## III.   Sentencing Legal Principles

The Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).  The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion. *Molina-Martinez* v. *United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh* v. *United States*, 133 S. Ct. 2072, 2087 (2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, 18 U.S.C. § 3553(a), which are: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States* v. *Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).

Under Section 3553(a), "in determining the particular sentence to impose," the Court must consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure.  *See Crosby*, 397 F.3d at 103.  First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id*. at 112; *see also United States* v. *Corsey,* 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence.").  Second, the Court must consider whether a departure from that Guidelines range is appropriate.  *Crosby*, 397 F.3d at 112.  Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose.  *Id.*  In so doing, it is entirely proper for a judge

to take into consideration his or her own sense of what is a fair and just sentence under all the circumstances. *United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## IV.   Section 3553(a) Analysis

In his plea agreement, Short agreed that the loss amount in this case exceeds $9.5 million, and that his applicable sentencing range under the U.S. Sentencing Guidelines is 78 to 97 months. In the Presentence Report, the Probation Office has recommended a Guidelines sentence of 78 months. In light of Short's central role in the huge and longrunning fraud charged in this case, the Government respectfully submits that a sentence within the applicable Guidelines sentencing range of 78 to 97 is necessary to reflect the seriousness and aggravated nature of Short's crimes, provide just punishment, afford general deterrence, and promote respect for the law. *See* 18 U.S.C. § 3553(a)(2)(A).

### A.   The Nature and Circumstances of the Offense

#### 1.   The Defendant's Role

The defendant played a critical role in the scheme. For approximately three years, between the summer of 2012 and the fall of 2015, Short's company E.M. Systems operated various sales floors, often referred to as boiler rooms, that cold-called over 19,000 vulnerable people in debt and promised to reduce their overall debt burdens or negotiate with their lenders in exchange for fees of up to $1,495. These calls were conducted through scripts which carefully screened victims who still had active credit cards that could incur more debt to pay Short's telemarketers for these guaranteed outcomes. In thousands of instances, however, these representations were deceptive and false, and left victims even more in debt. As reflected in hundreds of consumer complaints or chargeback requests, instead of a guaranteed reduction of their debt through interest rate reduction and negotiation with lenders, what many victims actually received was a simple budgeting booklet to fill out that encouraged them to save more money themselves. Short knew that his customers were complaining about being deceived and were applying for chargebacks. *See, e.g.*, Ex. C.

In order to process his victims' credit cards for the duration of the scheme, Short entered into a bank fraud conspiracy with Brandon Becker and others at CardReady, through which they created 26 sham merchant accounts controlled on paper by "signers" through which Short's telemarketers could run their transactions. As noted above, these sham accounts helped to conceal Short's real business from the Wells Fargo, First Data, and First Pay, and to perpetuate it. As Wells Fargo and First Data persistently shut down sham merchant accounts after receiving customer complaints of being defrauded, Short and his co-conspirators at CardReady would simply open new sham accounts in another "signer's" name for Short's telemarketers to use. (PSR ¶¶ 18-19.) Short knew that CardReady was submitting false documents to the processing entities to create and maintain his accounts. Such false documents included the account opening documents signed by random people with no connection to his business, and "chargeback reduction plans" that offered false excuses purportedly from the "signer" about the reason for the excessive chargebacks and supposed plans to reduce them going forward.[5]

---

[5] For example, these chargeback reduction plans purported to explain the reasons for the excessive chargebacks demanded by defrauded customers as resulting from an error in how the charges were being reported on customers' credit card statements, "confusing the charge with one that they did

And although Becker and others at CardReady were principally responsible for creating and opening these merchant accounts through misrepresentations to the processing entities, Short actively participated in these deceptions.  For example, using his own employee, Short created websites for each of these sham merchant accounts that made them appear as if they were separate, independent, businesses.  These websites, which would be shared with processing entities to make each merchant appear legitimate, omitted any reference to Short and E.M. Systems.  Short signed internal agreements prepared by CardReady that identified the strawman "signer" for each business, ensuring that the signers would be permitted to keep only approximately 3% of the net revenues that Short would run through their businesses.  Short communicated with his co-conspirators at CardReady at the outset of the scheme about how to portray these sham businesses to the payment processors as selling financial "coaching" and budgeting products, rather than the impermissible interest rate reduction and debt consolidation services that would in reality be offered to persuade victims to sign up.  He developed and sent his co-conspirators so-called "verification" scripts of what telemarketers would say to the victims during a recorded portion of a phone call that would seek to minimize customers' ability to claim that they had not received a paid-for service.[6]

Short's participation in this scheme was not a one-time mistake or a fleeting lapse in judgment.  Time and time again, Short made conscious choices to continue to facilitate frauds on countless individual victims, and to cover up his fraud with lies and deception.  After the first sham merchant account was successfully opened through misrepresentations to First Pay, First Data, and Wells Fargo Bank, Short coordinated with co-conspirators at CardReady about opening more merchant accounts to process payments from additional boiler rooms with potentially hundreds of telemarketers.  For example, on September 27, 2012, Short sent a message to co-defendant Steven Breier reading in part:

> Hey bud just wanted to shoot you an update, 1st week totals $5,970 this week $14,325 and as long as the wire goes in tomorrow with out [sic] issues, they will be sending even more volume next week. Just wanted to give you a little peace of mind. I know you [sic] wicked busy but if you get a chance to have someone send over the [] contract for the new rooms they are blowing up my phone ready to go and they have volume, two more 150 man rooms are standing by. Let me know when you get a chance. Thanks[]

Since merchant accounts were opened by the processing entities with a limit on the total dollar amount of transactions that could be processed each month, such as $100,000 per month, Short and his co-conspirators carefully planned out how to distribute victims' charges through multiple sham merchant accounts.  They discussed when new accounts would open, how many charges to run through each account, and what accounts to use for the maximum billed charge of $1,495.  Short was the face of the underlying telemarketing operation for CardReady and was the

---

not authorize," or a rogue, terminated "sales employee unintentionally confusing customers about the services and its cost".  *See* First-Data-DOJ-0001364.

[6] *See, e.g.,* Bates # USAOCR_REL_001 (Forward of e-mail from Short by CardReady co-conspirator, and noting "Below are the revised scripts.  Steve [Short] is amending the t&c's on the urls to say that the 3rd party services are free and they do not assume any liability on what happens with the free stuff they get.")

principal decisionmaker with the respect to the running of that operation. Put simply, emails and text messages make clear that Short was closely involved in creating the sham merchant businesses with Brandon Becker and other co-conspirators, and Short was the most culpable individual with respect to the operation of the underlying telemarketing scheme.

Short received weekly e-mails from CardReady's Chief Operating Officer with detailed excel spreadsheets reporting on every transaction that his telemarketers processed, including the name of the customer, the sham merchant account under which the customer's credit card was charged, the amounts of each charge, and the total amounts of money being deposited toward the various companies running the telemarketing scheme. Short also knew—through periodic emails, text messages, and calls from his co-conspirators at CardReady, that consumers were reporting being deceived after being sold a "package that lowers interest rates," and were filing an extraordinary number of chargeback requests. *See* Ex. C. Emails also make clear that he knew that his sham merchant accounts were frequently being closed. *Id.* It did not matter; Short and his co-conspirators at CardReady could simply open new sham merchant accounts that would appear to be brand new companies, with signers provided by CardReady's co-conspirators. Every time he did that, Short made a separate, conscious choice to steal from the victims and to defraud the payment processors. And he made that choice repeatedly over the course of more than two years. This systematic, methodical, and egregious conduct supports a substantial sentence of incarceration.

Short's conduct during this scheme was marked by pure greed and disregard for the well-being of his victims. At the outset of the E.M. Systems/CardReady scheme in the fall of 2012, Short knew that the interest reduction services that were going to be pitched to vulnerable consumers would be provided, supposedly, through his own wife, Karissa Dyar. Short also knew, as of October 2012, that the FTC had concluded that Short's wife had failed to provide many consumers with exactly those types of services in a predecessor scheme that was enjoined by the FTC.

As Short admitted to the FBI, customers of E.M. Systems were supposed to receive interest rate reduction services from a company operated by Dyar, and that the interest rate reduction was included in the guaranteed lowered budget promise that his telemarketers had pitched. (*See* Ex. A, at 5.)[7] But as Short knew, the FTC had obtained a preliminary injunction in October 2012 against certain other individuals running a strikingly similar telemarketing scheme that sold interest rate reduction services to consumers to be provided by Dyar's predecessor company. *See FTC v. Pro Credit Group, et al.*, 12 Civ. 586(MSS), ECF 161 (Oct 17, 2012). In October 2012, Dyar e-mailed Short an Order from the United States District Court for the Middle District of Florida, granting a motion for preliminary injunction that stated, among other things: "Karissa Dyar and her company Consumer Budget Services ('CBS'), served as the 'fulfillment center' for the Defendants. Dyar testified that she entered into oral agreements with Robinson and Balsamo to negotiate credit reductions and other concessions from creditors on behalf of the consumers who purchased the Defendants' products. . . . The FTC also introduced evidence that no interest reductions of any kind were obtained on behalf of many customers." *See* Ex. D (October 27, 2017 Email).

---

[7] Tellingly, Short stated that he did not know who actually received lowered rates nor did he track that information, although he  insisted that some customers received a rate reduction.

Short knew that what he was doing was wrong.  He agreed to give up approximately one third of each customer's charged payment to CardReady for its cut and other processing fees.  This amount was more than *15 times higher* than the 2% credit card processing fee Short admitted to the FBI he had previously paid another payment processor for his prior tanning and tattoo businesses.  (*See* Ex. A, at 8.)  Short's agreement to give up a third of his revenue to CardReady for the sham accounts and processing fees evidenced two things about his criminal intent:  (1) he knew he could not obtain and maintain processing through a legitimate merchant account, and (2) he could afford to give up an extraordinary one third cut to his co-conspirators because of the excessive amounts charged to his victims.

Short also knew that a proportion of the new money charged to new victims was being held by CardReady in reserve to account for chargebacks for prior customers who complained of being defrauded.  Rather than stop the scheme Short, Becker, and other co-conspirators discussed how to generate more money from new merchant accounts and new victims.  For example, in May 2014, CardReady's Chief Operating Officer e-mailed Short a spreadsheet showing chargeback activity on each of the then-24 sham merchant accounts that had been used for Short's telemarketers, writing "Steve, these numbers continue to be terrible.  If this program was stopped we would bleed out nearly a million dollars in the first three months.  We are going to have to take more reserves to accumulate more protection.   Right now any money that has been made is at risk."   (*See* e-mail from Jim Berland to steve.emsystems@gmail.com, dated May 27, 2014, attached hereto as Ex. E.)  Put another way, Short knew that even if no new sales were made, it would cost nearly a million dollars just to cover the expected chargebacks by prior victims.  Short and his co-conspirators did not want to pay that money out of their own profits.  Instead, they agreed to victimize additional people.

By May 2014, as shown in a detailed CardReady spreadsheet, at least 16 of the then-existing 24 sham merchant accounts secretly being used by E.M. Systems had already been closed or were pending closure by First Data.  In the preceding month, a lower-level CardReady employee had called some of the consumers who disputed the charges appearing on their credit card bills from these sham merchant accounts.  In an internal CardReady document, the employee reported, for example, that one consumer "said she received a call out of the blue from Resources Financial Budgeting, saying they could decrease her credit cards to 3%, and have $3,500.00 paid on her Capital One credit card for a $895.00 one time fee. . . . she's [yet] to see the $3,500.00 paid on her Capital One credit card." (Ex. F.)  Another customer reported that she was told by two agents on a phone call that she had no choice but to utilize their company's services to lower her APR, interest, and payments.  As the CardReady employee remarked in this internal document upon learning that the consumer's age was 50:  "At first I thought merchant preying on the elderly. It appears they are preying on all." *Id.*

As the scheme neared its end, and CardReady came under increasing scrutiny by the payment processors and by the FTC, Short and his co-conspirators faced the problem of continuing to pay chargebacks and refunds to unhappy and defrauded customers.  Like a Ponzi scheme that relies on new investor money to repay old investors, Short and CardReady executives then formed two additional sham merchant accounts in June 2014, for the express purpose of helping the co-conspirators pay off refunds from earlier customers.  As with the prior accounts, Short instructed a subordinate to create websites for these supposedly separate sham businesses, with names like consignedsavings.com and addressmysavings.com, which in reality were just additional fraudulent

alter egos of Short's telemarketing operation.   Between June and October 2014, these last two accounts processed over $1.6 million from new victims for Short and his co-conspirators, until they too were closed by First Data.   At the same time, CardReady came under regulatory and payment processing scrutiny, effectively ending the scheme.

### 2.   The Impact on the Victims

Remarkably, the victims are largely absent from the narrative in Short's sentencing memorandum.  Short does not acknowledge that thousands of people in debt were scammed into paying up to $1,495 for what amounted to be worthless paper booklet and were denied the promised guaranteed refunds.   A review of the statements made by these victims as part of their complaints is a haunting tour of the human wreckage caused by a fraud of this scope and dimension.[8]

The victims are a diverse cross section of people of all ages, backgrounds, and life circumstances.   They include disabled people struggling to survive on limited social security payments.  There are older people, pensioners whose days in the workforce have concluded, with no means of repaying their debts.   In this scam, all of the victims have in common the additional aggravating fact that they were targeted for already having significant credit card debt.   These were not wealthy people who lost money in a risky investment.  They were people struggling to handle their financial situation and desperate for a guaranteed promise to lower their existing debt.

For example, the victims include a 72-year old Michigan woman[9] working part time in retail who was scammed out of $1,095 in exchange for a guaranteed lower interest rate and savings of $3,000 and obtained neither, causing significant hardship:   "As a result of their refusing to refund my $1095 or lower the interest rate as promised, I was forced to find an alternative method of attempting to pay off my credit card debt.  I ultimately had to liquidate my 401K in order to finish off the upstairs of my property in order to refinance which only caused me more financial stress." (Ex. G-1, ¶ 18.)  A 62-year-old victim who had to stop working due to medical reasons was scammed out of $1,295 through a false promise to lower interest rates on her credit cards, reported that she "[felt] mentally tormented, especially because I repeatedly called customer service and received no help from the company.  (Ex. G-2, ¶¶ 3, 29.)  A 78-year-old retiree in Kentucky was promised an interest rate reduction in about 15 days and savings of at least $4,000 in exchange for a $695 payment; in many ensuing calls thereafter, the customer service representatives then repeatedly told him they were working on the reduction and refused to refund his money. (Ex. G-3, ¶¶ 5-13.)  Another senior citizen from Florida, paid $1,095 to lower her high interest rates on debt incurred from home repairs caused by a hurricane.  (Ex. G-4, ¶ 4.) At the time she was targeted by Short's telemarketers, she was also dealing with profound medical issues. (*Id.*) After persistently calling customer service, only to be promised a call back that never came, she heard that the telephone number had been disconnected. A 78-year-old retiree from Colorado living off approximately $650 a month from Social Security was charged $1,095, an additional expense that was a "tremendous burden." (Ex. G-5, ¶¶ 3, 23.)

---

[8] The Government is enclosing victim statements made in declarations to the Federal Trade Commission which it respectfully requests to file under seal to maintain their privacy.

[9] All ages reported are as of the time of the victims' declarations to the FTC, principally in 2015.

Some victims maxed out their credit cards with these bogus charges. Others were told that the fee would max out their card and were instructed to give the telemarketers a card with a lower balance to run the charge. (*See, e.g.,* Ex. G-6, ¶ 6.) A disabled, retired former U.S. Postal Service employee from Puerto Rico had to provide three different credit cards because the first two did not even have enough of a credit limit to accommodate the $1,495 charge. (*Id.*)

Many of these victims received the cold calls during a particularly vulnerable time in their lives. As another victim, a then-63-year-old clerical employee from New Hampshire,  who was scammed out of $1,295, put it:

> When the economy dropped, I began to rely on credit cards for things like oil, property taxes and sometimes groceries. As I am a single paycheck household, I really felt the pinch. Then my younger sister moved in with me due to her financial troubles. It was an additional financial drain for me and I relied on credit cards even more. . . . All during this time, I was trying to get out from under that debt without having to declare bankruptcy. So the call by Resourceful Budgeting came at a time I was very vulnerable."

(Ex. G-7, ¶ 6.)

Another victim, a 65-year old woman from Iowa, received the call while she "was working 12 hour nights at a battery factory and was on the verge of losing my job because the lant I was working at was scheduled to close." (Ex. G-8, ¶ 3.)

A former factory worker received a cold call from Insightful Budgeting (one of the 26 sham merchant names) just a week after she retired to take full time care of her disabled 78-year-old husband. "The call from Insightful Budgeting came the next week and I thought it was an opportunity help dig us out of the hole we were in." (Ex. G-9, ¶ 7.) After paying $1,095 to lower her interest rates, she received a "customized budget plan", which "was not a plan at all" but "just said to pay more on each credit card and the card would get paid off quicker than if I just continued to make the minimum payments. That was just common sense and not advice I would pay $1,095 to receive." (*Id.* ¶¶ 9, 17.)

In many cases, as shown by the attached victim affidavits (Ex. G-1 to G-26), consumers were falsely told that interest rate reductions were in progress to placate them, and to make it less likely that a chargeback would be successful due to the passage of time from the initial charge. They experienced additional stress persistently trying to get ahold of the customer service for these sham companies to check on their interest rate reductions or refund requests that never came.

Indeed, the sheer diversity of woe in Short's wake distinguishes him from many other types of white collar fraudsters in this District. This is not a case in which the measures of harm verge on the theoretical. The defendant ran an operation that stole from thousands of real people using false pretenses. He and his co-conspirators lied to a bank and processing companies to process the money from those thefts. He did it on a grand enough scale to have caused over 19 million of dollars in damage. His sentence should reflect the reality of the pain he caused.

While Short has accepted responsibility for the offense by pleading guilty, he has utterly failed to manifest any contrition or remorse for the victims. At least based on his sentencing submission, Short characterizes his "bad decision" in this case as choosing to do business with CardReady (Br. at 5), and incredibly portrays himself as a victim that was "used in a very limited

capacity . . . by a much larger and sophisticated organization." Short's arguments are simply self-serving delusions. This is not a defendant who was trying to do the right thing through the wrong means and fell in with the wrong crew. To be clear, Short was CardReady's client who came armed with a telemarketing operation, ready to scam victims, and needing credit card processing. The true victims are the consumers victimized by Short's telemarketers and the processing entities deceived into processing their charges. Short did not use victims' money in any sort of attempt to earn more money back for them, like building out staff to actually attempt to lower their debt burden and interest rates. Instead, Short largely spent his victims' money on his telemarketers' commissions, CardReady's cut, and his own profits.

Throughout the scheme, Short continued to launch additional merchant accounts for more boiler rooms even as the prior accounts were being closed and his victims were filing of complaints and chargeback requests. He did not care. He did not stop. He did not cut his victims' losses. He simply committed more and more frauds, with more lies, more victims, and more devastation in his wake. The extraordinary damage Short has caused to his innocent victims warrants a stiff punishment within the Guidelines range.

**B. History and Characteristics of the Defendant**

The Government recognizes that Short has reported a low-income childhood, with a mother who struggled to provide the basic necessities for a proper upbringing. (PSR ¶ 57.) It is unfortunate that having experienced financial struggle, Short would turn to victimizing other people in dire straits. Nor was it necessary in any sense. By the time Short launched the E.M. Systems scheme, he was in a loving and stable relationship with his wife, had taught himself information technology, and had already worked as a network administrator and human resource manager. (*Id.* ¶¶ 59, 76, 79-90.) Short's decision to launch a telemarketing scam and a sophisticated bank fraud show that his crimes were driven by greed, and not by financial necessity.

Short has submitted letters attesting to his positive personal qualities as a family man and friend. *See* Def. Br., Ex. A. It is, of course, appropriate for the Court to take these letters into account in connection with sentencing. However, the Government asks that, in so doing, the Court consider the following four points. First, these attestations to Short's positive personal qualities do not distinguish him from other similarly situated white-collar defendants—individuals who, despite having many opportunities and a network of people who love and support them, nonetheless choose to steal and defraud. As Judge Marrero astutely observed, this sort of letter:

> falls into a pattern advanced by a subset of the white collar criminal. . . . The list of their   achievements and virtues is long and impressive. Let us count the ways. At home, they are   good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors.

*United States* v. *Regensberg*, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010).

Second, the letter writers' attestations to Short's positive qualities, such as the claim that he is "a good man with a kind heart," (Deft. Sent Mem. at 4), have diminished value because Short has demonstrated an extraordinary ability to operate a scheme that deceived thousands of victims. Short was the face of a telemarketing operation that appeared to have included large numbers of

hundreds of telemarketers, customer service lines designed to discourage victims from filing chargeback requests, individualized websites to give legitimacy to the product, and dozens of shell companies. Short and his co-conspirators successfully maintained the scheme from detection by a large financial institution and sophisticated payment processors that had departments dedicated to detecting fraud. Given that Short was successful in deceiving so many people for so long, the attestations he has presented to his positive character do not bear significant weight.

Third, to the extent that Short or the letter writers suggest that Short "living with the consequences of his actions since 2015" somehow warrants a lighter sentence, this claim should be rejected. In 2015, Short's scheme was terminated and he entered into a stipulated judgment with the FTC for $12,365,731—an amount that Short and his wife settled with the FTC by forfeiting frozen asset valued at a mere $55,902[10]. It is hard to see how this modest payment constitutes "living with the consequences" of a $12.3 million fraud. Meanwhile, many of his victims have continued to struggle. In any case, any notion that successful white-collar criminals should be sentenced more lightly than defendants of a lower socioeconomic status cannot not be countenanced. "It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States* v. *Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) (citing U.S.S.G. § 5H1.2); *see also United States* v. *Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("In imposing a sentence of one day with credit for the day of processing, the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life. '[N]one of these things are [his] sentence. Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." (citation omitted)); *United States* v. *Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."). As the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States* v. *Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted).

Finally, as discussed above, this is *not* a case where the offense conduct was wildly aberrant or prompted by a brief lapse in judgment or where, as a result, it might be appropriate to give more

---

[10] Pursuant to Section VII of the FTC judgment, the monetary judgment was suspended on the condition that those frozen funds and other physical assets (e.g. cars and personal property) of Short, his wife, and E.M. Systems that were held by the Receiver were liquidated and transferred to the FTC and the Florida Attorney General's Office.

weight to the defendant's otherwise law-abiding life.  For more than two years, Short's full-time job was victimizing thousands of people in debt and lying to a bank.

Accordingly, even crediting the testimonials Short has submitted in connection with sentencing—and the Government does not in any way question their sincerity—the defendant has shown himself to be a fraudster and thief, and not someone who deserves any benefit of the doubt with respect to this Court's judgment of his character.

## C.  The Need to Afford Adequate Deterrence

One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).  Courts have generally recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative."  *United States* v. *Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997).  "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."  *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted).  "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.* It is particularly important to deter those individuals, like the defendant, who have the skill and ability to victimize people remotely, such as a telemarketing operation in Florida that reached over 19,000 people nationwide.

There is also a heightened need for specific deterrence in this case.  As noted, the defendant was motivated by greed, undeterred by the potential consequences.  When his own wife was accused by the FTC of failing to provide interest rate reduction services to consumers in debt in October 2012, Short did not hesitate to launch a similar scheme where his wife would once again be purportedly responsible for providing such services.  In the middle of 2013, Short's co-conspirators at CardReady brought to his attention another FTC enforcement litigation against telemarketing debt relief companies in Florida (where Short's operation was based) that falsely promised to save consumers thousands in credit card debt. As one CardReady executive wrote to Becker and Breier, attaching the FTC complaint, "From what I see there is great exposure here and we should be shutting this animal down as quickly as we can without it crashing.  If they do not have a defense for the type of charges contained in the link here, there is no defense that will work and our merchants"—i.e. the signers—"are fully exposed." (*See* email from James Berland dated April 25, 2013, attached hereto as Ex. H.) Just like Short's telemarketing scam, the entities charged in that complaint cold-called consumers and promised them interest rate reduction, and then sent consumers nothing more than a rudimentary financial plan that included a comparison between how much consumers would pay on their debts if they only paid the minimum amount versus greater payments toward principal.  Far from being deterred from the FTC's pursuit of exactly his type of scam, Short sent an email purporting to distinguish his operation, and the scam continued.  In the Spring of 2014, Short was not deterred by payment processors rapidly closing merchant accounts who were experiencing a tidal wave of chargeback and refund requests.  He simply doubled down and opened more accounts to victimize more people.  In fact, even when the accounts were all closed in 2015 Short continued to correspond with CardReady to attempt to find new accounts to keep the scam going.  The Government respectfully submits that a significant prison sentence is necessary to truly impress upon Short the wrongfulness of his actions and deter him from future misconduct.

## V.  The Defendant's Arguments

### A.  Short's Role

Short is particularly inaccurate in contending that he played a more minor role than all other co-conspirators, and that these co-conspirators have not been held accountable for their conduct.  (Def. Br. at 8.)  The leader of the charged conspiracy was Brandon Becker.  But central roles were also played by Short ███████████████████████████████████████████████ ███████████████.  First, Short was not some sort of minor player.  He was the face of the telemarketing operation.  His prohibited telemarketing scheme was a linchpin, or the foundation, for the entire credit card processing scheme. It was Short who, through his business with his wife at E.M. Systems, directly found the more than 19,000 victims in the case, and deprived them of more than $12.9 million in net losses. Without Short providing that foundation, there would have been no credit card processing scheme.  And even as to the credit card processing scheme, Short played a central role, helping to establish the 26 sham merchants, helping provide fraudulent information for their sham merchant account applications and create websites, and helping respond to repeated waves of inquiry from First Data and First Pay. Short's role was neither limited nor simple, as he would now have this Court believe.

Second, Short is also wrong in contending that his principal co-conspirators have escaped justice (*id*), or that he is "the first [person] to accept responsibility and enter a guilty plea" (*id.* at 11).  Becker is facing trial in December.  Breier pled guilty to all four counts against him in the S2 superseding indictment in the instant case. (*See* Minute Entry, Apr. 7, 2021).   And other co-conspirators ██████████████████████████████████████████ been charged and pleaded guilty to multiple felony counts, in other cases, charging the full scope of their conduct.  All of these co-conspirators are awaiting sentencing, which is expected after the trial of Brandon Becker. [11]

### B.  Short's Statements to Law Enforcement

In the course of an earlier investigation into Short's telemarketing scheme, in the Middle District of Florida, Short was interviewed by the FBI in 2015.  During that interview, Short dramatically misrepresented his own fraudulent intent and conduct.  Now, in a remarkable assertion, Short claims that this untruthful interview represented "cooperation" with the FBI in Florida (Def. Br. at 8), and that that interview "opened the door" for the unrelated investigation by the U.S. Attorney's Office in the Southern District of New York. (*Id.* at 9.)

These claims are absurd.  Short was never interviewed by any agents handling the investigation brought by the U.S. Attorney's Office in the Southern District of New York.  The

---

[11] The charges in each of these related cases are sealed, as are the pleas and the status of their cases. Disclosure is made here solely for the purposes of the Short sentencing, and the defense is expected to continue to treat this as sealed information.  The Government requests that Paragraph 22 of the PSR is amended to reflect that ████████████████████████████████████████████████
████████████████████████████

instant prosecution did not grow out of the earlier Florida investigation. And by the time Short was interviewed by agents handling a separate, ultimately closed, investigation in another U.S. Attorney's Office, he was already named in a complaint by the FTC in connection with the E.M. Systems scheme, along with various players at CardReady. Importantly, the investigation in the instant case in no way grew out of or relied upon the (misleading) 2015 Florida interview of Short.

Second, Short's characterization of his Florida interview as "cooperation" is ridiculous, in light of the misleading statements that Short made in that interview. Among other things, Short completely mispresented his own role, describing it as limited to "building the websites, shipping and receiving the product, storing customer data, etc." (Ex. A, at 2.) In truth, Short connected the entire telemarketing scheme to CardReady, finding customer-victims and selling them these prohibited "debt consolidation" services—services that were so grossly misrepresented that approximately one third of their gross receipts had to be paid back in refunds and chargebacks (more than $6 million of the $19.7 million that the defrauded customers initially paid). As for the massive refunds paid to customers, Short mendaciously attributed this to a purported computer crash at E.M. Systems in 2014, and falsely claimed that customers were provided refunds whenever E.M. Systems could not achieve a promised savings of 10%. (*Id.* at 4-5.) In fact, as evident by the attached victim affidavits, many customers were not paid refunds at all. Some of Short's most egregious claims to the Florida investigators were his false denials that he understood and helped establish the sham merchants and to complete the sham merchant applications. (*Id.* at 8.) Short falsely told investigators that he "believed that the resellers [the signers for the sham merchants] were actual individuals who were interested in selling his product." (*Id.*) This fundamentally misstates the purpose of the sham merchants and the sham merchant accounts – a process in which Short was repeatedly involved, both in helping to assign parts of the E.M. Systems business to different sham merchant accounts, and in creating new sham merchant accounts as First Data and Wells Fargo closed earlier sham merchant accounts.

## C. Short's Continued Protestations of Innocence

Despite Short's guilty plea, the defendant continues to claim that he believed the prohibited debt reduction program that he sold was a "legitimate . . . internet-based budgeting program." (Def. Br. at 11 (emphasis supplied).) He does not appear to acknowledge that his telemarketers guaranteed interest rate reductions and specific debt decreases that would be negotiated in exchange for massive one-time payments from the victims. Instead, Short is asking the Court to believe that his victims paid upwards of $1,495 for a website with a budgeting program and a booklet with common sense advice. This is the same lie, incidentally, that Short and CardReady's advanced to the processing entities when they characterized each sham merchant account as a financial coaching company, concealing that behind the scenes telemarketers were making false promises and guarantees to lower vulnerable people's interest rates. Short's suggestion that he believed he was selling a legitimate product without misrepresentations belies common sense. As one of the many victims who paid $1,095 related, rather than any actual debt reduction, she received a so-called "customized budget plan" that was "not a plan at all – it just said to pay more on each credit card and the card would get paid quicker than if I just continued to make the minimum payments." (Ex. G-9, ¶ 5, 9, 17.) The fact that the defendant is persisting in this claim shows that there is a strong need for specific deterrence in this case.

## VI.  Several of the Defendant's Objections to the Presentence Report Should Be Rejected

At the end of the Defendant's sentencing memorandum, the defense sets forth several tardy objections to the Presentence Report.  As to most of those objections, the Government does not take issue.  But the Government does address three of the defendant's objections, as follows.

### A.  Defense Objection to Paragraph 23 (Shared Responsibility for the Fraud)

The defendant raises three different objections to paragraph 23 of the Presentence Report. He objects to: (1) the lack of a precise loss amount, (2) the failure to state that the loss is the joint responsibility of all the co-conspirators, and (3) the failure to assign relative roles to various co-conspirators.

As to the loss amount, it is $12,365,731.  As noted above, this is the precise amount to which Short, Dyar, and E.M. Systems (as well as Becker and others) stipulated in settling civil charges with the FTC.  (*See* Exh. 1.)  That number derives from the $19,718,305 in gross receipts that E.M. Systems took from its customers, less the more than $6 million in refunds and chargebacks that such customers successfully demanded during the course of the fraud scheme.

As to the defendant's other two objections, the Government does not take issue, but seeks to address them in the following proposed language for an amended paragraph 23:

> 23.  **STEVEN SHORT** and his co-conspirators are responsible for a loss amount of $12,365,731.  The leader of the scheme was Brandon Becker, who supervised co-conspirators at CardReady, ███████████ ███████████████████████████ **SHORT** actively participated in the conspiracy, and was the principal contact for the underlying telemarketing scheme.

### B.  Defense Objection to Paragraphs 24[12] and 97 (Victims)

#### 1.  The Number of Victims and Amount of Restitution

The defendant's objections to paragraphs 24 and 97 are closely related, in that each addresses the need for a precise number of victims for restitution.

First, the defendant has already stipulated in his plea agreement that the appropriate amount of restitution is $1,912,090.05. (PSR ¶ 7(k).)  But the defendant objects (Def. Br. at p.31) that the Government has not identified specific victims.  However, that is no longer the case.  In the proposed Order of Restitution, filed in conjunction with this letter, the Government has identified 1,961 remaining victims who still have not received restitution.

Accordingly, paragraphs 24 and 97 should be amended, to reflect that the Government has identified 1,961 victims who are still owed restitution totaling $1,910,600.05.[13]

---

[12] The defendant's sentencing memorandum mistakenly identifies the paragraph to which he is objecting as paragraph 23.  But from the quotation in the memorandum, it is clear that the defendant is addressing paragraph 24.  (*See* Dkt No. 161 at 27-28).

[13] In documenting the 1,961 victims identified in Attachment A to the proposed Order of Restitution, the restitution figure adds up to $1,910,600.05—some $1400 less than the figure of

### 2. The Defendant's Irrelevant Statements about Another Civil Settlement Have No Bearing on the Instant Sentencing

The defendant's objections to paragraph 24 also contain inaccurate assertions about a settlement in an FTC civil case against First Pay/First Data[14] and First Pay's former principal, Vincent Ko. (Dkt. No. 161 at 28.)  Those assertions have no bearing on this sentencing.

First, the defense makes the indefensible statement that "[t]he undersigned has always maintained that if there is a 'victim', it could be Bank-1, Wells Fargo, and therefore only ONE victim."  (*Id.*)  This is a direct contradiction to the plea agreement, in which both the defendant and his counsel stipulated that there are more than 10 victims in this case.  (*See* PSR ¶ 7(d).)

Second, the defense sets forth a distorted description of an FTC civil case that resulted in a judgment against First Pay/First Data and Vincent Ko.  In that FTC case, which encompassed civil allegations of failures regarding both the E.M. Systems business and other customers of First Pay / First Data, the FTC did indeed obtain a large civil settlement.  Indeed, it is the Government's understanding that more than $10 million of that settlement went to pay victims of the E.M. Systems/CardReady scheme charged in the instant case.  But we are informed by the FTC that 1,961 victims of that scheme remain uncompensated, in the amount of $1,910,600.05.  This is thus the basis for the victims and amounts identified in Attachment A to the proposed Order of Restitution.  There is no need for the Court to further address the defendant's objections to paragraph 24.

### C. Defense Objection to Paragraphs 81 & 82 (Ownership of the Marital Residence)

The defendant also objects to Paragraphs 81 and 82 of the Presentence Report.  In particular, he claims that his residence in Seminole, FL (the "Residence") should not be counted as one of his assets because it is not marital property, but rather is property that his wife, Karissa Dyar, bought with income she earned as a nurse.  (Def. Br. at 30.)

The Government disputes this wholly unsupported claim, but respectfully submits that it is not an issue that the Court needs to resolve at sentencing.  This appears more appropriately an issue to be resolved as the Government seeks satisfaction of the orders of forfeiture and restitution, in the course of related future litigation.

Moreover, there is reason to question the defendant's claims about how the Residence came to be in the name of his wife.  First, Dyar was one of Short's co-defendant's in the parallel civil action, *FTC v. E.M. Systems, Short, Dyar, et al.*, 15-cv-1417-T-23AEP (M.D.Fla.), with alleged wrongdoing going back at least to 2012. (*See* Exh. 1 (stipulated settlement and judgment entered into by both Dyar and Short).)  Second, the timing of the transfer of the ownership of the Residence from joint ownership to ownership by Dyar alone seems quite suspect, and gives some reason to question whether it was a fraudulent conveyance designed to protect Short's assets from criminal forfeiture.  In particular, Short was arrested in this case on July 7, 2021, and according to public records, the transfer occurred if the Residence took place just ten days later, on July 17,

---

$1,912,090.05 stipulated in the plea agreement.  The Government has no objection to the use of this slightly lower restitution figure.

[14] First Pay and First Data were separate entities at the time of the scheme charged in the instant case, although First Data later acquired First Pay.

2021.  Short's claim that he has no interest in the house also lacks credibility because it appears that he had previously hidden his interest in the Residence.  While the defendant apparently told Probation that the Residence was purchased in 2000 (*see* PSR ¶ 81), this appears to contradict sworn financial statements that both Short and Dyar submitted to the FTC in 2015, under penalty of perjury.  Both Short and Dyar stated on their sworn financial statements that they owned no real property.

On this record, which gives substantial reasons to question Short's claims about the true ownership of the Residence, there is no reasons or basis for the Court to amend the Presentence Report. Nor is there any need to resolve this issue at this time in order to proceed with sentencing, since the parties have already stipulated to the proper amount of restitution and forfeiture.

## VII.  Orders of Restitution and Forfeiture

Accompanying this letter, the Government is submitting a proposed Order of Restitution consistent with the plea agreement and the Presentence Report ¶¶ 7(k), 97, directing restitution to 1,961 victims in the amount of $1,910,600.05.

The Court previously entered a Preliminary Order of Forfeiture / Money Judgment in the amount of $8,833,889.69.  (Dkt No. 129; Aug. 16, 2022.)  That forfeiture amount was also agreed in the plea agreement, representing the amount of the fraud proceeds of which Short had custody or control.

CONCLUSION

For the reasons set forth herein, the Government respectfully submits that Short should receive a sentence within the stipulated Guidelines sentencing range of 78 to 97 months, as recommended by the Probation Office, and that the Court should enter the attached proposed order of restitution.

Respectfully,

DAMIAN WILLIAMS
United States Attorney

By:         S/
            DAVID RAYMOND LEWIS
            VLADISLAV VAINBERG
            SARAH Y. LAI
            Assistant United States Attorneys
            (212) 637-2397 / 1029 / 1944

cc: Robert D. Eckard, Esq. (by ECF)